No. 4005

Second Circuit

BAKER ET AL. v. COLBERT ET AL.

(July 14, 1931. Opinion and Decree.)
(October 1, 1931. Rehearing Refused.)

Isaac Wahlder, of Alexandria, attorney for plaintiffs, appellees.

Thornton, Gist & Richey, of Alexandria, attorneys for defendants, appellants.

McGREGOR, J. Roberta Baker, the widow of Charlie Baker, brings this suit for herself and for and in behalf of her three minor children, issue of her marriage with her deceased husband. On May 31, 1930,

and for several weeks prior thereto, the deceased, Charlie Baker, was in the employ of the defendant, D. W. Colbert, in road construction work between Dry Prong and Verda in Grant parish. The deceased and all of the crew on this particular job were living at the time at Colfax in said Grant parish, and it was the custom for all of them except one or two to meet at a certain filling station in Colfax every morning to be conveyed free of charge in one of defendant's trucks to the particular point along the road where they were engaged in the said work, and to be returned to Colfax every night by the same means of transportation. Between Colfax and Dry Prong, where defendant was working his crew of men under his contract, there is a stream of water known as Bayou Darrow, and on Friday, May 30, this bayou began to be overflowed with backwater from Red river. Defendant's truck, which usually conveyed his men from Colfax to Dry Prong, made the trip safely Friday morning, but by Friday evening the water had risen so high it was not considered safe to drive it over the bayou. Consequently, the crew was transported in the truck to the north side of the bayou were it was stored for the night. The rest of the trip home was made by these men in the automobile of Boss Bannister, defendant's foreman, who undertook to drive his car through the water in spite of its depth. The car went dead in the water and the negroes got out and pushed it to dry land and the trip home was then successfully finished. On the next morning, Saturday, May 31, according to instructions, the crew assembled at the usual time and place and prepared to go to their work in Bannister's car instead of the defendant's truck, as was their custom. The entire crew, including Charlie Baker, the deceased, loaded into the car and were driven to the south side of the bayou. The water had risen so high it was impossible to drive the car across, so it was parked on that side and Bannister had the men conveyed over in a ferryboat that was operating at the point for the convenience of the public. When they reached the north side of the stream, they loaded into the truck that had been parked there the evening before, and were driven to Dry Prong where they worked all day, Saturday, May 31st. Near the close of the day Colbert, the defendant, brought checks to pay off all the men for two weeks' time and left them with his foreman, Boss Bannister, to be delivered to the men at the end of the day's work. He then left the scene to return to Colfax, but as he left he secured from Bannister permission to drive his car from the south side of Bayou Darrow into Colfax with the promise that he would drive it back to the edge of the water to meet him, Bannister, and his men in time to take them home after the day's work was ended. When Bannister secured passage for his men on the ferryboat on Saturday morning, he made arrangements with the ferryman to meet them again that evening to transport them back to the south side of the stream, and told him that he would at that time pay for both trips across.

Late Saturday evening, after he had delivered their checks for two weeks' work, Boss Bannister, defendant's foreman, had all the men loaded into defendant's truck and they were driven to the north edge of the stream. The truck was parked or stored nearby and the men were then loaded into the ferryboat to be transferred to the south or Colfax side of the bayou, which by that time had risen to a great height. According to his agreement, the defendant was on the south side with Bannister's car waiting to carry them on to

Colfax. The waters were so turbulent and the load so heavy, the boat capsized in midstream and three men, including Charlie Baker, plaintiffs' husband and father, and Boss Bannister, defendant's foreman, were drowned. Defendant bore all the expense in connection with the death of Charlie Baker, but refused to pay any compensation to the widow for herself or for her three minor children. As a consequence of this refusal to pay any compensation on account of the death of deceased, the plaintiffs brought this suit for 65 per cent of $15 per week for a period of three hundred weeks. The lower court rendered judgment in their favor as prayed for, and the defendant has appealed.

## OPINION

The law of this case is plain and undisputed, so that questions of fact only are involved. The contentions of the plaintiff may be said to be fourfold.

(1) That there was an express or implied contract of employment of the deceased Charlie Baker and of all of the rest of the men working with defendant on this job, which included and carried with it the obligation of the defendant to transport or convey him and them to and from their labor.

(2) That under this contract the men, including the deceased Charlie Baker, husband and father of the plaintiffs, were actually conveyed to and from their work for a period of about three weeks immediately prior to the date of the death of the deceased.

(3) That at the time of the death of the deceased he was being conveyed home by the defendant through his agent and foreman, in accordance with the terms of the contract of employment.

(4) That as an emergency means of transportation over a part of the route from the scene of work to the home of plaintiffs' deceased husband and father, the defendant's foreman, Boss Bannister, secured the use of a ferryboat to transport the deceased and the others across Bayou Darrow, and that he exercised control over them while they were being transported over this turbulent stream.

The fact of the transportation, the means of conveyance, the manner of the death of the deceased, and the amount of the wages, $15 per week, paid to the deceased, are all admitted by the defendant, but it is his contention and defense that the transportation was a matter of accommodation for the convenience of the men, without any obligation on the part of the defendant and that, therefore, there is no liability on his part for any accident or death that may have occurred as a consequence thereof.

## ANALYSIS OF THE TESTIMONY

(1) E. Spencer, a witness for the defendant, testified that free transportation was furnished by the defendant to all the men, and that they were all given to understand that they were to meet the truck for that purpose at a certain place in Colfax each morning.

H. L. Lewis, another witness for the defendant, testified that there was a definite agreement with the defendant that all of the men should meet at a certain filling station in Colfax and be conveyed free of charge in defendant's truck from Colfax to the scene of work every morning, and that they were to be returned in the same way at the end of each day.

Earnest Wiggins, a witness for the plaintiff, testified that the defendant conveyed the laborers, including the deceased Baker,

free of charge to and from their work every day, and that that was the only way of getting to the work that any of them had.

Henry Armstead, a witness for the plaintiff, testified that he asked the defendant for a job, and that he was told to be at the filling station and that he would be taken to and from the work in defendant's truck. He is very definite and positive in his testimony that the defendant agreed to convey all of the men to and from their work, and that he actually complied with this agreement.

D. W. Colbert, the defendant himself, testified that the deceased worked for him first on a job at Tioga and that he took him in his car personally each day from his home in Alexandria. He testified further that without any special contract Baker continued with him on the job at Dry Prong, where he was working at the time of his death. He states positively that his truck went to Colfax every day and night and that the men rode it to and from work, but that it was a loan or a matter of accommodation. In the course of his testimony along this line, he did not swear positively that he had no agreement with the men to transport them to and from their work, as is shown from the following extract from his testimony when he was being examined on the trial by his own attorneys.

"Q. Armstead and Wiggins both stated that they had an agreement with you about driving them out there?
"A. I never had an agreement with any of them about transporting them out there.
"Q. Are you positive about that?
"A. No, I wouldn't swear to it.
"Q. But you are up there swearing?
"A. I am not certain.
"Q. You can't remember having such an agreement?

"A. It was not my policy. If I said anything to any of them I merely said 'the truck is coming in at night and going out in the morning; catch it if you want to.' That's as far as I intended going."

Defendant knew that the men had been riding his truck and that they had no other way to go out to the work. The evidence is conclusive that the truck made the trip each day for the sole purpose of transporting the men. It was not necessary to take it that distance each day for any other purpose. Defendant insists that he considered the use of his truck as an accommodation to the men. He states that he had purchased a tent for their accommodation, and that he was insisting on their using it so as to obviate the necessity of taking the truck in each day in order to transport them. This would indicate that he was giving this transportation as a matter of right, and not as an accommodation. He wanted to substitute the tent for the transportation as being less expensive to him.

(2) On the question of the fact of the transportation of defendant's employees to and from their work, counsel for defendant in their brief say:

"Every morning at about six or six-thirty o'clock one of the defendant's employees would get the truck and take it to a certain filling station in Colfax for gas and oil, and some of the defendant's employees who lived in Colfax, would go to this filling station and board this truck and ride on it out to the point where their labors were to be performed, and in the evening after their labors were over, were permitted to ride back on the truck.

"Such had been the custom for a period of about three weeks when the back water from Red River, which had reached a state of very high water in the meantime, reached a point on the Jefferson Highway on the north side of Bayou Darrow. The back water came up over the road for the first time on Friday afternoon, and the truck of the defendant which had been

coming all the way to Colfax on Friday evening, was stored on the north side or the opposite side of the Bayou from the town of Colfax."

This statement of counsel is an absolute admission of the fact of the transportation, and it corroborates the contention of the plaintiff to a large extent. Counsel are very earnest in their contention that this was a pure matter of accommodation, but the fact remains that without the transportation the defendant could not have obtained the laborers. The testimony stated above is very persuasive of the correctness of plaintiffs' contention. All the witnesses testify with varying degrees of positiveness that there was a definite agreement for the free transportation, and that without it none of the laborers could have been secured. Defendant makes much of the fact that the laborers' time of service began only from the time they actually began work each day on the job. This is not important and proves nothing.

(3) On the day of the fatal disaster, the deceased and all of defendant's crew of men working on the Dry Prong job were conveyed in defendant's truck from the scene of the work to the north bank of Bayou Darrow. The truck was parked or stored nearby and under the direction of Boss Bannister, defendant's foreman, they were all loaded into the ferryboat to be crossed over the stream. Several of the men were afraid, but when the defendant's foreman, Boss Bannister, ordered them to do so they all obeyed and got on the boat. Bannister had conducted them across this same stream that morning in this same boat and had engaged it then for the same purpose that evening. The boat was a conveyance procured and provided by the defendant through his agent and foreman just as much as was the truck which they rode

to the water's edge. The men were in charge of defendant's foreman, who was directing their every movement. Defendant's own witness, H. L. Lewis, was very positive in his testimony that Bannister was in control of the men and directing their movements on the boat. Earnest Wiggins and Henry Armstead, witnesses for the plaintiffs, both testified along the same line. Furthermore, the evidence is clear that the defendant himself instructed Bannister to bring the men across on the ferryboat, and told him that he would meet them on the south or Colfax side, and just as the catastrophe was happening defendant actually drove up in Bannister's car as he said he would do.

(4) For three weeks the deceased and the other men were conveyed back and forth in defendant's truck. When the high water came, in order to continue the work, it became necessary to supplement the means of transportation with the ferryboat. This was done by Bannister, defendant's foreman. Transportation was provided on each side of the water in the form of a truck on one side and an automobile on the other. Over and across the water the deceased was transported that morning by means of a ferryboat, and defendant's agent and foreman made arrangements to have him conveyed back in the same way that evening. If deceased had lost his life while the truck was being conveyed in the ferryboat (if it had been), it could certainly be said that he lost it while being transported by the defendant. If an attempt had been made to drive the truck through the water over the bridge and deceased had lost his life by the truck being washed from the bridge, it certainly would have been in the course of being transported over the stream by the defendant.

The law with reference to the liability of an employer under the Employers' Liability Act (Act No. 20 of 1914, as amended) in cases where an employee is injured or loses his life, while being transported to or from his work, is so well settled that it is not necessary to do more than state it. Both plaintiff and defendant cite and rely upon the case of Taylor v. Gulf Refining Co. of Louisiana, 11 La. App. 270, 122 So. 162, 164, and quote extensively from it. The following rule quoted in that case as being the clearest and most comprehensive expression of the law on the point involved reads as follows:

"When the employee is injured while riding to or from his work in a conveyance provided by the employer, after the real beginning of the employment, in compliance with one of the implied or express terms of the contract of employment for the use of the employees, and is one which the employees are required, or as a matter of right are permitted to use, by virtue of the contract, the injury may be held to have arisen out of and in the course of the employment so as to entitle an employee to compensation."

This same rule of law is expressed in slightly different language in 10 A. L. R. 169 in the following words:

"It is generally held that where transportation is furnished by an employer as an incident of the employment, an injury suffered by the employee going or coming in the vehicle so furnished by the employer, and under his control, arises out of and is within the course of the employment, within the meaning of Workmen's Compensation Acts."

Applying the law as above stated to the evidence adduced on the trial of the case, the irresistible conclusion reached by us is that the deceased, Charlie Baker, lost his life while riding from his work in a conveyance provided by the defendant through his agent and foreman, Boss Bannister, after the real beginning of his employment, in compliance with the implied and express terms of his contract of employment. The conveyance was one which the deceased was both permitted and required to use by virtue of the contract. For three weeks the defendant had recognized the necessity as well as the obligation of transporting his men to and from their work every day. The preponderance of the testimony conclusively proves that it was not only an implied, but an express, contract to this effect. Since the defendant was thus under obligation to transport his men, including the deceased, while everything was normal, it was also his duty to meet any emergency that might arise and take the necessary steps therefor. He appears to have recognized this obligation, for with his knowledge and consent, his foreman, Boss Bannister, made the necessary arrangements with the ferryman to convey the men over the swollen Bayou Darrow. Defendant cannot avoid his liability by saying that all this transportation was a matter of accommodation on his part. It was not. If the men had had other definite arrangements of transportation and if, as a matter of convenience, defendant had permitted the deceased occasionally to ride with him or on some of his trucks, then it might be said with some degree of plausibility that it was a matter of accommodation that he was riding defendant's truck and the ferry provided by the defendant. But such is not the case. It was the unvarying rule and not an exception for the deceased to go to and from his work in the conveyance provided by the defendant for that purpose.

In the case of Taylor v. Gulf Refining Co. of Louisiana, cited and relied upon by both plaintiffs and defendant, the plain-

tiff failed to recover for the very good reason that, when the deceased lost his life by drowning, he was using a conveyance other than the one provided by the defendant. Such a state of facts does not exist in the present case. In support of their contention, counsel for defendant have cited a number of cases.

Erickson v. St. Paul City Railway Co., 141 Minn. 166, 169 N. W. 532. In this case the defendant had a crew of men engaged in maintaining, altering, and repairing its power lines in the city of St. Paul. The men lived in various parts of the city and came to work and returned to their homes in any manner that they chose. The defendant did not convey them to their work, nor return them to their homes. The plaintiff in the case, on one occasion after the day's work was over, got on the defendant's truck to ride it in the direction of his home because it happened to be going that way. A collision occurred, and he was injured. The court very correctly held that the transportation was purely a matter of accommodation, and that the injury was not received in the course of his employment. The case is not like the one under consideration in any particular and cannot, therefore, be used as authority in reaching a decision.

Counsel for defendant rely strongly upon the case of Nesbitt v. Twin City Forge & Foundry Co., 145 Minn. 286, 177 N. W. 131, 132, 10 A. L. R. 165, and quote from it as follows:

"It was involved in Podgorski v. Kerwin [144 Minn. 313, 175 N. W. 694], supra, where the court said: 'It is a well-settled general rule that an injury suffered by an employee in going to or returning from the employer's premises where the work of his employment is carried on, except in special instances not here involved, does not arise out of his employment so as to entitle him to compensation.'

"Upon this general rule some courts have ingrafted the following exception: 'When an employee is injured while riding to his place of work in a conveyance provided by the employer, after the real beginning of the employment, in compliance with one of the implied or express terms of the contract of employment, for the mere use of the employees, and is one which they are required, or, as a matter of right, are permitted, to use by virtue of that contract, the injury may be held to have arisen out of and in the course of the employment so as to entitle the employee to compensation.'"

The facts of that case are stated by the court as follows:

"Defendant was making shells for the United States government at Stillwater, in this state, carrying on its business in two separate buildings, respectively known as the 'upper' and the 'lower' plant. A large number of men were employed in each building. Plaintiff worked at the upper plant, as a furnace feeder. He worked eight hours per day, was paid by the hour, and received pay from the time when he 'punched in' on the time clock in the building where he worked. The upper plant was located a mile or more from the end of the nearest street car line. The men employed there objected to walking from the car line to the plant when they went to work. To satisfy them, defendant put in service two of its automobile freight trucks, running them from the upper plant to the car line to carry its employees to and from their work. It was part of his contract of employment that plaintiff, in common with other employees, should have the right to ride gratis on these trucks in going to and returning from his work. While thus riding on his way to his place of work, but before reaching it, and before the beginning of the period for which he received wages, he was injured as the result of the negligence of the driver of the truck, and brought this action to recover the general damages."

The defendant, Twin City Forge & Foundry Co., sought to have the case disposed of under the Employers' Liability Act, but

the court refused to do so, and approved a verdict under the general law because of the defendant's negligence. The facts of the case are on all fours with those of the case at bar, and for that reason counsel would have us depend on it as authority to sustain their contention in the present case. But the decision turned on a provision in the Compensation Act of Minnesota, which reads as follows:

"Not to cover workmen except while engaged in, on, or about the premises where their services are being performed, or where their service requires their presence as a part of such service at the time of the injury, **and during the hours of service** as such workmen." (Boldface type ours.) Minn. St. 1927, sec. 4326(j).

In answer to the arguments of defendant's counsel in that case, in their effort to have the case decided under the Compensation Act (the exact opposite of what counsel in the case at bar are urging), the court said:

"Defendant refers us to decisions of other courts that fairly sustain its contention that plaintiff's injuries were caused by accident arising out of and in the course of his employment.

"Donovan's Case, 217 Mass. 76, 104 N. E. 431, Ann. Cas. 1915C, 778, 4 N. C. C. A. 549, Littler v. George A. Fuller Co., 223 N. Y. 369, 119 N. E. 554, and Scalia v. American Sumatra Tobacco Co., 93 Conn. 82, 105 A. 346, are the leading American cases and are directly in point. The weight to be given them is lessened by the fact that they were decided under statutes which **do not contain the qualifying provision found in our statute and set out above.**" (Boldface type ours.)

It will be noted that this case turned on a special provision of the Minnesota Compensation Act which is not contained in our Employers' Liability Act and which is not contained in any of the other cases cited. Therefore, it cannot be used as authority in support of the defendant's contention. On the contrary, a close reading of the case shows that if it were not for this special provision of the Minnesota Compensation Act the judgment would have been the other way, and the injury would have been held to have been received in the course of the plaintiff's employment. The facts of the case are practically identical with those of the case at bar, and, instead of being authority against the contention of the plaintiff in the present case, it really supports the same.

The Donovan case referred to above is found in 217 Mass. 76, 104 N. E. 431, Ann. Cas. 1915C, 778. The facts in the case are stated by the court as follows:

"The contest here is between Donovan, an employee of one McGreevey, and an insurance company which had insured McGreevey under the provisions of St. 1911, c. 751, part 5, sec. 3, as amended by St. 1912, c. 571, sec. 17. The point in dispute is whether Donovan's injury arose out of and in the course of his employment, within the meaning of part 2, sec. 1, of the act of 1911 above cited. See McNicol's Case, 215 Mass. 497, 102 N. E. 697 [L. R. A. 1916A, 306]. This must be decided upon the facts found by the Industrial Accident Board in its review of the report of the arbitration committee. St. 1911 c. 751, part 3, secs. 5, 10, 16, as amended by St. 1912, c. 571, secs. 10, 12-15.

"Donovan was employed by McGreevey in cleaning out catch-basins at a place about two miles from his home. It had been and was his custom, in common with other employees and with the knowledge and consent of his employer, to ride to and from the vicinity of the catch-basins in a wagon furnished by his employer, the wagon meeting the employees on the street and the employer being notified if any of the employees failed to report for work at the beginning of the day. The wagon was at the service of the employees at the end of the day, and they might ride in it back to the employer's barn if they wished.

Donovan was injured while so riding in this wagon at the end of his day's work, and the board has found that his transportation on the wagon was 'incidental to his employment,' and 'therefore' arose 'out of and in the course of said employment.' The language of this last finding is a little obscure; but we treat it, as both counsel and also the superior court have treated it, as being an inference that Donovan's injury arose out of and in the course of his employment, drawn from the other facts stated, including the fact that the transportation was 'incidental to his employment.' The question to be decided is therefore whether this inference could be drawn from those facts; for the facts themselves now cannot be inquired into. St. 1912, c. 571, sec. 14."

In the course of its opinion, in sustaining the judgment of the lower court in favor of the plaintiff, the Supreme Judicial Court of Massachusetts said:

"The finding of the Industrial Accident Board that Donovan's transportation was 'incidental to his employment' fairly means in the connection in which it was used, that it was one of the incidents of his employment, that it was an accessory, collateral or subsidiary part of his contract of employment, something added to the principal part of that contract as a minor, but none the less a real feature or detail of the contract. Whatever has been uniformly done in the execution of such a contract by both of the parties to it well may be regarded as having been adopted by them as one of its terms. Especially is this so where none of the provisions of the contract have been shown by either party, but everything is left to be inferred from their conduct."

Notwithstanding the fact that counsel for defendant strenuously urge that all the transportation of the deceased by the defendant was a matter of accommodation pure and simple, near the close of their brief they make the following statement:

"The only facts that are proven in this case are that prior to the high water back-ing over the Jefferson Highway at a point about two miles from Colfax, this deceased had been riding on defendant's truck from Colfax to the road job in the morning and back in the afternoon. It is clear that there was no express agreement or contract that the plaintiff should so ride on said truck between the two points. However, had there been no high water, and this deceased had been killed while riding on this truck to and from his work, we are frank to state that we believe the Court would be justified in holding that such an accident was within the exceptions to the general rule hereinabove stated, for the reason that this defendant knew that the deceased was riding this truck and knew that the distance to the job was some twelve or fifteen miles, and that deceased could not reasonably go there and back without some means of transportation, either furnished by himself or by the defendant. However, since Bayou Darrow was only about two miles from the business portion of the town of Colfax, and the impediment to the transportation by said truck was at a point so near the town of Colfax, and on account of said impediment it was impossible for the truck on which deceased had been riding, to travel along the Jefferson Highway to a point nearer than two miles from Colfax, can it be said that there was any implied agreement, or any obligation whatsoever, on the part of this defendant to provide other transportation to these employees, the short distance of two miles beyond which it was impossible for the defendant's truck to go?"

We consider the ferryboat just as much a means of transportation, provided by the defendant, as the truck. The fact that the water to be crossed was only two miles from Colfax did not relieve the defendant of his obligation to transfer the deceased and the rest of the crew all the way from the scene of work to their home at Colfax.

For the reasons assigned, the judgment appealed from is affirmed; the defendant to pay all the costs of both courts.